STATE OF VERMONT

ENVIRONMENTAL COURT

|  | } |  |
|---|---|---|
| In re: Dodge Farm Community, LLC, Concept Plan | } | Docket No. 155-7-07 Vtec |
| (Appeal of Burns) | } | |
|  | } | |

<u>Decision and Order on Cross-Motions for Summary Judgment</u>

Appellants Catherine and Legrand Burns appealed from a decision of the Development Review Board (DRB) of the Town of Berlin, granting concept plan approval to Appellee-Applicant Dodge Farm Community, LLC (Applicant) for its proposed Planned Unit Development. Appellants are represented by L. Brooke Dingledine, Esq.; Applicant is represented by Richard W. Darby, Esq. and Christopher J. Nordle, Esq.; and the Town is represented by Robert Halpert, Esq. Interested persons Romeo J. and Valerie D. Cyr have entered an appearance representing themselves.

Applicant Dodge Farm has moved for summary judgment on Questions 2, 3, and 4 of the Statement of Questions; Appellants have moved for summary judgment on all the Questions in the Statement of Questions. The Town and interested persons Cyr have not filed any memoranda addressing the motions for summary judgment. In this <u>de novo</u> appeal, the Court must apply the substantive standards that were applicable before the DRB. 10 V.S.A. § 8504(h), V.R.E.C.P. 5(g).

The parties provided the Zoning Regulations adopted in 2005. For the purpose only of comparison for the analysis in footnote 1, below, the Court has used a copy of the Zoning Bylaws last amended in 2002, taken from an unrelated closed case. The following facts are undisputed unless otherwise noted.

1

Applicant owns an approximately 300-acre property located at the southerly end of the Knapp State Airport in Berlin. Four-fifths of the property (243.5 acres – "the Southerly Project Property") is located southerly of the airport runway and southerly of Scott Hill Road and Airport Road, with frontage along both roads. An air easement benefitting the airport extends over some of the project property to the south of the runway. The remaining 62.2 acre portion of the property ("the Northerly Project Property") is located northeasterly of the airport runway and northerly of Airport Road, with frontage along Airport Road.

Portions of the property are located in each of three zoning districts. The Southerly Project Property contains 61 acres of land in the Rural Residential zoning district, located in an L shape along the road frontage and along the property's easterly boundary. The remaining 182-acre portion of the Southerly Project Property is located in the Highland Conservation zoning district. Appellants' residence is located within a large parcel of land, westerly of the project property, also within the Highland Conservation zoning district and with access to Scott Hill Road.

A narrow Light Industrial zoning district extends easterly from the boundary of the airport. The Northerly Project Property northerly of the road contains 47 acres of land in the Light Industrial zoning district, and an additional 16 acres of land in the Rural Residential zoning district.

Applicant proposes to create a clustered co-housing development in which most of the acreage of the project property would be maintained in agricultural or recreational/open space use. The proposal is proposed to involve two clusters of housing units held in condominium ownership, with a common community center, common areas and agricultural, recreational and other unimproved lands held in common. The former owner of the property retains the right to continue to reside in his house on the property.

The term "planned unit development" is defined in the state statute as land "to be

2

developed as a single entity, the plan for which may propose any authorized combination of density or intensity transfers or increases, as well as the mixing of land uses." 24 V.S.A. § 4303(19). Applicant has applied under the Planned Unit[1] Development (PUD) provisions in § 4.10 of the 2005 Zoning Regulations, which requires approval of any deviations from the Zoning Regulations under the standards in § 4.10, requires site plan approval under § 5.05, and requires application concurrent with subdivision review under the Subdivision Regulations.

Under § 300 of the Subdivision Regulations, "[b]efore submitting a formal application" a subdivider is required to submit a concept plan. Concept plan review "is intended to be an informal exchange of ideas between the applicant and the [Planning] Commission. Presentations, and suggestions, and comments of any party are not binding." Subdivision Regulations, § 300. Compare discussion of "sketch plan" application, In re Champlain Oil Co., 2004 VT 44, ¶ 12, 176 Vt. 458, 461–62.

The DRB reviews concept plans for their conformance with the applicable regulations and the Town Plan, and it may offer recommendations to be incorporated in subsequent submissions. Subdivision Regulations § 310. The consequence of concept plan approval is simply that the applicant may proceed to the next step in the subdivision review process, that of preliminary plan review. Subdivision Regulations §§ 320, 330.

Applicant proposes two clusters of housing on the property, with the remainder

---

[1] Planned unit developments may include a mix of residential uses, nonresidential uses, or both, while planned residential developments contemplated only include a mix of residential uses (and their accessory uses). Compare, the former statute's authorization of planned residential developments in 24 V.S.A. § 4407(3) (2004) separately from its authorization of planned unit developments in 24 V.S.A. § 4407(12) (2004). Section 4.10 of the prior Zoning Bylaw had been entitled Planned Residential Development, which may explain some of the residual references in § 4.10 and elsewhere in the Zoning Regulations to that term. The present statute's enabling authority for planned unit developments is found in 24 V.S.A. § 4417, which is referred to in § 4.10.

largely proposed to remain in agriculture or as forested land. One cluster of housing units, labeled "Cluster B," is proposed to be located in the Rural Residential and Light Industrial zoning districts, in the northeastern area of the Northerly Project Property. Cluster B is proposed to contain 30 housing units, with access to Airport Road by an approximately 1500-foot-long access roadway. A plant nursery is proposed for the portion of the Northerly Project Property near Airport Road, with several horse or walking trails extending through the property.

The other cluster of housing units, labeled "Cluster C," is proposed to be located in the Highland Conservation zoning district, near the westerly boundary of the Southerly Project Property. Thirty-four housing units are proposed for Cluster C, with access to Scott Hill Road by an approximately 1200 foot long access roadway. Most of the housing units in Cluster C are proposed to surround a central "green" and a "common house," with seven other units located farther to the south near a garden area. A trail or path for walking or horses is also proposed for the Southerly Project Property.

Section 4.10(D) establishes standards for the approval of PUDs. The first of two subsections numbered as subsection (2)[2] states in full that:

> The use may be for residential and non-residential units and must be a prescribed use for the district in which it is located.

The parties do not disagree that the phrase "a prescribed use for the district" means that the use is allowed either as a permitted or a conditional use in the particular district. However, the parties disagree as to whether § 4.10(D)(2$_1$) allows PUDs to be composed of a mix of land uses, all of which must be uses otherwise separately allowed in the district, or whether, as argued by Appellants, the district must list "planned unit development" as a listed use in order for a project to be considered as a PUD.

---

[2] This section will be cited as § 4.10(D)(2$_1$) to distinguish it from the second one.

4

In fact, none of the district regulations list the use category of "planned unit[3] developments" either as a conditional use or as a permitted use in any district. Therefore, an interpretation of § 4.10(D)(2$_1$) that required PUDs themselves to be a listed use in all three districts would render the entirety of § 4.10 surplusage. Like statutes, zoning ordinances are to be interpreted to give effect to the intent of the legislative body, to further fair and rational consequences, and to avoid surplusage and absurd results. In re: Kim Wong Notices of Violation, Docket Nos. 169-7-06 Vtec and 293-12-06 Vtec, slip op. at 2 (Vt. Envtl. Ct. Mar. 12, 2007); Loiselle v. Barsalow, 2006 VT 61, ¶16, 180 Vt. 531, 534; Judicial Watch, Inc. v. State, 2005 VT 108, ¶¶ 14, 16, 179 Vt. 214, 220–222.

On the other hand, a reading of the regulation that instead examines the component uses proposed for the PUD avoids an absurd result, avoids rendering any part of the regulation mere surplusage, and comports with a plain reading of § 4.10(D)(2$_1$) in the context of the ordinance's and statute's provision for planned unit developments. PUDs are a tool allowing for mixed uses and flexible or clustered development. Zoning Regulations § 4.10(B). Despite this flexibility, a goal of zoning remains to phase out nonconforming uses and to avoid creating new nonconforming uses. In re Miserocchi, 170 Vt. 320, 327 (2000). If § 4.10(D)(2$_1$) is read to refer to the component uses within a proposed PUD, it achieves the goal of providing for mixed uses and allowed alterations to the otherwise-required dimensional standards, without creating any new non-conforming uses in the district.

This interpretation also makes it unnecessary to determine whether the use category of PUDs could be applied for as a conditional use in each district, because each district's use

___

[3] Planned residential developments are listed specifically as a conditional use in only two of the residential zoning districts: the Rural Residential zoning district and the Medium-Density Residential zoning district, which would mean that in those districts such proposals would have to meet the conditional use standards of § 5.06, as well as the other standards that would have to be met for PUDs.

table allows the DRB to consider uses as conditional uses if they are not listed but are "of the same general character as those permitted or allowed as conditional uses in the district." Zoning Regulations Tables 2.01, 2.03, 2.08. If PUDs had to be considered under these provisions, the DRB would be comparing them to their component uses in any event.

In the present case, the agricultural and forest uses, one- and two-family dwelling, and private club or common accessory building are allowed uses in all three of the zoning districts. Zoning Regulations Tables 2.01, 2.03, 2.08. Therefore, under § 4.10(D)(2$_1$), Applicant may proceed with its application as a Planned Unit Development.

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED that Appellants' Motion for Summary Judgment is DENIED and Appellee-Applicant's Motion for Summary Judgment is GRANTED, that the proposed project may be applied for as a PUD.

At a telephone conference in this matter, the parties agreed that the merits of the concept plan, that is, Question 1 of the Statement of Questions, should not be litigated separately but should be folded in to the following stages of the application, as the plan itself may be expected to change during the next stage of review. Accordingly, a telephone conference has been scheduled (see enclosed notice) to discuss the next steps in this matter and whether mediation would be useful at this stage of the proceedings, or whether this appeal may be closed with leave to the parties to raise any remaining issues if an appeal is filed of any later stage of the plans for this property.

Done at Berlin, Vermont, this 24th day of March, 2008.

_____
Merideth Wright
Environmental Judge